**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON, DIVISION**

| | | |
|---|---|---|
| **JORGE CORTEZ, et.al.,** | § | |
| **Plaintiffs,** | § | |
| | § | **Civil Action No. 3:18-cv-00183** |
| **V.** | § | **JURY DEMANDED** |
| | § | |
| **GALVESTON COUNTY, et. al.,** | § | |
| **Defendants.** | § | |

## <u>PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT46 & 48]</u>

TO THE HONORABLE JUDGE JEFFREY V. BROWN:

The Court should deny Defendants, Galveston County and Sheriff Trochesset's Motion for Summary Judgment pursuant to the Federal Rules of Civil Procedure Rule 56. Plaintiffs file this combined response to their motion. In support of said response, Plaintiffs provide:

# TABLE OF CONTENTS

**TABLE OF CONTENTS**                                                                     **1**

TABLE OF AUTHORITIES                                                                       **2**

OBJECTIONS TO DEFENDANTS' SUMMARY JUDGMENT EVIDENCE                 **5**

PLAINTIFFS' SUMMARY JUDGMENT EVIDENCE                                          **6**

**INTRODUCTION**                                                                            **7**

**UNDISPUTED FACTS**                                                                       **13**

DISPUTED FACTS                                                                              **21**

STATEMENT OF ISSUES                                                                        **24**

Whether Plaintiffs' medical malpractice wrongful death claims are barred due to Mr. Cortez had a significantly lower than 50% chance of surviving his pre-existing mesothelioma disease.                                                                   24

Whether Plaintiffs' constitutional wrongful death claims are barred due to Mr. Cortez had a significantly lower than 50% chance of surviving his pre-existing mesothelioma disease.                                                                                    24

Whether Defendants' actions of delaying adequate medical care to Mr. Cortez was objectively reasonable.                                                                        24

Whether Defendants were deliberately indifferent to Mr. Cortez's serious medical needs in their actions of delaying adequate medical care to Mr. Cortez.                    24

Whether Defendants' actions of denying adequate medical care to Mr. Cortez was objectively reasonable.                                                                        24

Whether Defendants were deliberately indifferent to Mr. Cortez's serious medical needs in their actions of denying adequate medical care to Mr. Cortez                      24

Whether the evidence demonstrates that failing to address and treat Mr. Cortez's complaints of shortness of breath—a serious medical need—and then send him out for emergency medical care violated the Fourth Amendment to defeat a qualified-immunity claim.                                                                     25

Whether Galveston County has a policy and practice of denying and delaying medical care of its inmates.                                                                        25

STANDARD OF REVIEW                                                                         **25**

**SUMMARY OF ARGUMENT**                                                     **27**

**ARGUMENTS & AUTHORITIES**                                                  **27**

Plaintiffs' constitutional wrongful death claims are not barred due to Mr. Cortez's chance of surviving his pre-existing condition was less than 50% and it is irrelevant to 42 U.S.C § 1983 claims under the constitution for inadequate medical care                                                                         27

Defendants' Delay and Denial of Adequate Medical Care to Mr. Cortez        37

A. Defendants were deliberately indifferent to Mr. Cortez's serious medical needs in their actions of delaying adequate medical care to Mr. Cortez           37

B. Defendants were deliberately indifferent to Mr. Cortez's serious medical needs in their actions of denying adequate medical care to Mr. Cortez           41

II.  Defendant Sheriff Trochesset is not entitled to qualified immunity because he was personally involved in the unconstitutional treatment of Mr. Cortez as the policymaker, and supervisor of the Medical Contractor, Soluta/Boon Chapman, and Defendants' misconduct resulting in delaying and denying adequate medical care to Mr. Cortez and actions were not objectively reasonable                          43

**CONCLUSION**                                                              **61**

## TABLE OF AUTHORITIES

**Cases**                                                                   **Pg(s)**

*Anderson    v.    Liberty    Lobby,    Inc.,*    477    U.S.    242    *27* (1986)............................................

*Armstrong   v.   Am.   Home   Shield   Corp.,*   333   F.3d   566   (5th   Cir.   *27* 2003)......................

*Austin     v.     Johnson     328     F.3d     204,     210     (5th     Cir.     38 2006)*............................................

*Baulch v. Johns, 70 F.3d 813 (5th Cir. 1995)*………………………………    *45*

*Boudreaux   v.   Swift   Transp.   Co.,   Inc.,*   402   F.3d   536   (5th   Cir.   *27* 2005)......................

*Brewer     v.     Wilkinson*,     3     F.3d     816     (5th     Cir.     *45* 1993)....................................................

2

*Brown v. Callahan*, 623 F.3d 249 (5th Cir. 2010) ………………………………….. *46,61*

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)...................................................... *25*

*City of St. Louis v. Praprotnik,* 485 U.S. 112, 131 (1988)..................................... *49*

*Cozzo v. Tangipahoa Par. Council-President Gov't,* 279 F.3d 273, 289 (5th Cir. 2002).................................................................. *46*

*Estelle v. Gamble*, 429 U.S. 97 (1976).................................................................. *41,43*

*Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) ………………..... *61*

*Farmer v. Brennan*, 511 U.S. 825 (1994)............................................................... *37*

*Flores v. City of Palacios*, 381 F.3d 391 (5th Cir. 2004)......................................... *44*

*Forsyth v. Barr*, 19 F.3d 1527 (5th Cir. 1994)....................................................... *26*

*Fraire v. City of Arlington,* 957 F.2d 1268, 1278 (5th Cir. 1992). ………………. *49*

*Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)........................................... *42,44*

*Grandstaff v. Borger,* 767 F.2d 161, 169 (5th Cir. 1985)......................................... *46,49*

*Ibarra v. Harris County*, 243 F. App'x 830, 836 (5th Cir. 2007).......................... *46*

*James v. Harris County,* 577 F.3d 612, 617-18 (5th Cir. 2009)............................. *49*

*Johnson    v.    Moore,*    958    F.2d    92,    94    (5th    Cir.    *46*
1992)..................................................

*King    v.    Brooks*,    68    F.3d    471    (5th    Cir.    *37*
1995)............................................................

*Kramer    v.    Lewisville    Mem'l    Hosp.,*    858    S.W.2d    397,    400    (Tex.
1993)..........................................................................................................    *29-31*

*Lawson    v.    Dallas    Cnty.,*    286    F.3d    257,    263    (5th    Cir.    *49*
2002)....................................

*Little v. Liquid Air Corp.*, 37 F. 3d 1069 (5th Cir. 1994)......................................    *25-27*

*Martinez    v.    Schlumber,    Ltd.*,    338    F.3d    407    (5th    Cir.    *26,28*
2003)....................................

*Malley    v.    Briggs*,    475    U.S.    335,    106    S.    Ct.    1092    *46*
(1986)........................................

*Milan    v.    City    of    San    Antonio,*    113    F.    App'x    622,    625    (5th    Cir.    *49*
2004).....................

*Monell    v.    New    York    City    Dept.    of    Social    Services,*    436    U.S.    658,    694    *48-49*
(1978)........

*Montano    v.    Orange    Cty.,    Tex.,*    842    F.3d    865    (5th    Cir.    29,53
2016).................................

*Mendoza    v.    Lynaugh*,    989    F.2d    191    (5th    Cir.    *38*
1993)...................................................

*Ontiveros    v.    City    of    Rosenberg,    Tex.*,    564    F.3d    379    (5th    Cir.    *45*
2009)........................

*Phillips    ex    rel.    Phillips    v.    Monroe    Cty.,    Miss.,*    311    F.3d    369(5th    Cir.    *54*
2002)...........

*Piotrowski    v.    City    of    Houston,*    237    F.3d    567,    578    (5th    Cir.    *49*
2001)...........................

*Rogers    v.    Boatright*,    709    F.3d    403,    410    (5th    Cir.    *42*
2013)...........................................

*Sabbie    v.    Sw.    Corr.,    LLC,    No.    5:17cv113-RWS-CMC,    2019    U.S.    Dist.*

*LEXIS 214463, at *131 (E.D. Tex. 2019)*....................................................... 55,58

*Santibanes v. City of Tomball, Tex.,* 654 F. Supp. 2d 593, 611 (S.D. Tex. 2019)......................................................................................................... 49

*Saucier v. Katz,* 533 U.S. 194 (2001)...................................................... 45

*Septimus v. Univ. of Hous.,* 399 F.3d 601 (5th Cir. 2005)....................................... 27

*Smith v. Brenoettsy,* 158 F.3d 908, 910 (5th Cir. 1998)................................. 55,57

*Stults v. Conoco, Inc.,* 76 F.3d 651 (5th Cir. 1996).................................. 26

*Tolan v. Cotton,* 572 U.S. 650 (2014).................................................................. 44

*Thompkins v. Belt,* 828 F.2d 298, 304 (5th Cir. 1987)............................................ 47

*Tubacex, Inc. v. M/V Risan,* 45 F.3d 951 (5th Cir. 1995)......................................... 26

*Turner v. Upton County, Tex.,* 915 F.2d 133, 136 (5th Cir. 1990)........................... 49,61

*Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir. 1984) (en banc)............... 49

*West v. Atkins,* 487 U.S. 42, 108 S. Ct. 2250 (1988)................................. 60

*Wiley v. State Farm Fire and Cas. Co.,* 585 F.3d 206 (5th Cir. 2009).................... 27

*Yale & Annie Slocum v. Livington*, No. H-11-486, 2012 U.S. Dist. LEXIS 79792, at *19 (S.D. Tex. June 8, 2012).......................................................... 56

 **Rules and Statutes**

42 U.S.C. § 1983

Fed. R. Civ. P. 56

Fed. R. Evid. 702
TEX. LOC. GOV'T CODE § 351.041(a)

### OBJECTIONS TO DEFENDANTS' SUMMARY JUDGMENT EVIDENCE

| Exhibits | Description | Objections |
|---|---|---|
| Ex. 1 | Affidavit of Jennifer Cagnon in support of Galveston County and Sheriff Trochesset's Motion for Summary Judgment. | Self-serving, Hearsay, Incomplete |
| Ex. 2 | Galveston County Sheriff's Office Booking Report. | Unauthenticated |
| Ex. 3 | Galveston County Sheriff's Office; Inmate Log: Cortez, Jorge Luis (Booking # 284167) | Unauthenticated |
| Ex. 4 | Transcript of the Testimony of K. Scott Lloyd, MD, FACP, FCCP. Volume: Date of Transcript: November 8, 2019. Case: Estate of Jorge Cortez, el al v. Galveston County, et al. | No objection |
| Ex. 6 | Affidavit of Henry Trochesset in Support of Galveston County and Sheriff Trochesset's Motion for Summary Judgment. | Self Serving, Relevance (FRE 401), prejudicial (FRE 403), hearsay. |
| Ex. 7 | Galveston County Sheriff's Office Manual of Policy and Procedure. | Unauthenticated, hearsay. |
| Ex. 8 | Galveston County Jail Budget vs. Expenses; Boon-Chapman. | Hearsay. |
| Ex. 9 | Affidavit of J. Eric Stupka, MD. | Includes Hearsay statements. |
| Ex. 10 | Business Records Affidavit; Galveston County Medical Examiner's Office. | No objection |

6

## PLAINTIFFS' SUMMARY JUDGMENT EVIDENCE

| *Exhibit* | *Description* |
| --- | --- |
| Ex. A | Autopsy by Galveston County Medical Examiner |
| Ex. B | Dr. Kenneth Lloyd Affidavit |
| Ex. C | Jail Medical Records |
| Ex. D | Sick Call Request |
| Ex. E | UTMB Medical Records |
| Ex. F | Kathy White Deposition |
| Ex. G | David Flores Affidavit |
| Ex. H | Sheriff Trochesset Video Deposition |
| Ex. I | Discipline Records |
| Ex. J | Other Inmate Records-(ie. Denise Pope, Custodial Death reports) |
| Ex. K | Boon & Chapman Policies & Procedures |
| Ex. L | Dr. Garry Killion Deposition |
| Ex. M | Dr. Stupka Deposition |
| Ex. N | Soluta Deposition |
| Ex. O | Galveston County Video Deposition |
| Ex. P | Brazoria and Hidalgo County Custodial Death reports |
| Ex. Q | Alexis Ensley Deposition |
| Ex. R | Videos of Medical Clinic |
| Ex. S | Medical Notes |

| Ex. T | Inmate Phone call to family |
| Ex. U | Excerpt from Jacqueline Burlingame Deposition/ Mr. Cortez grievance letter and response. |

## INTRODUCTION

1.     This case arises from a dispute concerning denial and delay of adequate medical care to the decedent, Jorge Cortez, while in the Defendants' custody, and conditions of confinement. [Dkt. 1 at 35 ¶ 149].

2.     On April 7, 2017, Jorge "George" Cortez ("Mr. Cortez"), 56, was taken into the custody of Galveston County Jail where he was awaiting placement in a drug treatment facility. [*See* County Def. Ex. A-1–Booking Report].

3.     At the time of booking and intake at Galveston County Jail, Mr. Cortez was unaware that he was suffering from mesothelioma, a rare type of lung cancer. [*See* County Def. Ex. C–Cortez Medical Records at GC05328].

4.      After booking and intake, Mr. Cortez immediately began to complain of dizziness to the jail staff and medical department. [*See* County Def. Ex. C–Cortez Medical Records at GC05310, GC05312-GC0513].

5.     He made his initial request for a bottom bunk bed assignment on April 11, 2017, he continued to request a bottom bunk on April 15, 2017, April 19, 2017, April 22, 2017, May 5, 2017, May 16, 2017, because he was dizzy and felt too weak to climb to his

assigned top bunk bed, and continued to request on numerous additional occasions from the time he entered custody and May 21, 2017, after he fell from the top bunk. [*See* County Def. Ex. C–Cortez Medical Records at GC05304-GC05305, GC05310, GC05312-GC05313].

6.      Alarmed by Mr. Cortez's obvious dizzy state and overall weakness, the other inmates informed the guards, requested on his behalf, that Mr. Cortez is assigned to a bottom bunk bed for his safety. [*Id*.]; [*See* Ex.  G - Aff. of David Flores].

7.      Mr. Cortez's symptoms were so obvious, resembling the flu, other inmates complained that he may get them sick. [*See* Ex. C–Cortez Jail Medical Records at GC05306].

8.      The medical personnel noted on multiple occasions that Cortez complained of breathing but no response was noted. [*See* Ex. S–Cortez Medical Department Notes].

9.      At the insistence of the other inmates, Mr. Cortez attempted to lay on the bottom bunk bed, [*See* Ex. G–Aff. of David Flores]; however, the jail staff ordered him to move to his assigned top bunk bed until he received an order from Soluta, the private healthcare personnel, to assess and evaluate his poor condition. [*See* Ex. C–Cortez Jail Medical Records at GC05280].

10.      Despite Mr. Cortez's poor declining condition Soluta denied or delayed the request to assess, evaluate, and treat Mr. Cortez's serious medical condition and complaints of dizziness, radiating pain, and shortness of breath. [*Id*.]. Shortly thereafter,

Mr. Cortez fell off the top bunk bed and complained of severe shoulder pain. [*See* Ex. C–Cortez Jail Medical Records at GC05297].

11.    Mr. Cortez reported to Soluta as a result of the fall. Soluta provided him with over-the-counter Ibuprofen pills, which did nothing to address or treat his serious medical issues. [*Id*.].

12.    After over two months of suffering from his serious medical conditions, and numerous complaints and request for a bottom bunk due to dizziness initially on April 17, 2017, Mr. Cortez was finally assigned a bottom bunk on May 22, 2017, although late. [*See* County Def. Ex.  A–Aff. of Cagnon at ¶ 4].

13.    Mr. Cortez's condition worsened so drastically that several inmates contacted their own family members and Mr. Cortez's family members to solicit aid for him, as documented in a jail recorded call from Floyd Lord on May 13, 2017. [*See* Ex. T–Jail Calls; Ex. U-Jacqueline Burlingame Depo]. He then became too weak to consume any food. [*See* Ex. C–Cortez Jail Medical Records at GC05279].

14.    On May 29, 2019, Mr. Cortez's health deteriorated so significantly that he could not get out of bed. [*Id*.]. The jail staff saw how poor Mr. Cortez's condition had become that jailers allowed him to forgo the sick call request protocol and took him by wheelchair to Soluta. [*See* Ex. B–Aff. of Dr. Lloyd]. Soluta's on-duty LVN Boykins performed a wholly inadequate respiratory exam. [*Id*.]. LVN Boykins determined that Mr. Cortez was not in need of further medical care and ordered him to return to his cell,

where Mr. Cortez was unable to move for 24 hours. [*See* Ex. C–Cortez Jail medical records at GC05279].

15.    On May 31, 2017, a few days later jailers again allowed him to forgo the sick call request protocol again and took him by wheelchair to Soluta, where Soluta's nurse practitioner, Carl Hart, examined Mr. Cortez, although not noted in the medical records, and it was only then that physician, Killyon finally acknowledged his serious medical needs on May 31, 2017. [*Id*.]. [*See* Ex. R–Video of Medical Clinic 05/29/17].

16.    Soluta sent Mr. Cortez for outside care to the emergency room via ambulance, with approximately four liters of fluid buildup in Mr. Cortez's right chest cavity. [*Id*.].

17.    The emergency department physicians were forced to drain the four liters that had built up in Mr. Cortez's lungs over an extended period of time, nearly two liters at a time to allow him to breathe.

18.    The drainage of the four liters was extreme but necessary. [*See* Ex. B– Aff. of Dr. Kenneth Lloyd]. Draining anything more than 1.8 liters that will pull on the lung and create a phenomenon called reexpansion pulmonary edema, exactly the complication Mr. Cortez suffered, resulted in respiratory failure. [*See* Ex. M–Dr. Stupka deposition transcript Pg. 18: Ln 20–25; Pg. 19:Ln 1–20].

```
15              Was there any evidence in the records that
16  you saw that -- that that's what happened with
17  Mr. Cortez's lung, that he may have had some of the
18  rapid expansion result from the drainage being so much,
19  up to four liters?
20      A.  Yes.
```

19.     Mr. Cortez was in a great deal of pain as he complained of often. Mesothelioma is

a "very painful cancer". [*See* Ex. M–Dr. Stupka deposition transcript Pg. 41:Ln 1–4].

20.     In this case, the Defendants' own expert (Dr. Stupka), Plaintiffs' expert (Dr.

Lloyd), and the medical examiner all concluded that Mr. Cortez suffered rapid lung

re-expansion due to 4 liters of fluid accumulating on his lungs. [Exhibit B, (Lloyd Expert

Depo), at 22:25-23:13; Exhibit E, (Stupka Depo), at 6-8; Exhibit F, (Medical Examiner's

Autopsy Rept.), at 3].

21.     On June 27, 2013, Mr. Cortez died as a result of respiratory failure, described as a

complication of mesothelioma. [*See* Def. Ex. F–Cortez Autopsy Report at 4n and Ex. E

UTMB Medical Records].


## NATURE AND STAGE OF PROCEEDING

22.     On June 24, 2018, Estate of Jorge "George" Luis Cortez, Jenny Espinoza, Amelia

Cortez, and Jacqueline Cortez Burlingame, individually as heirs, and survivors of Jorge

"George" Luis Cortez and as Representatives of Estate of Jorge "George" Luis Cortez as

Wrongful Death Beneficiary (collectively, the "Plaintiffs") filed a lawsuit contending Defendants' policies and procedures were deficient, causing Cortez's death. [Dkt. 1 at 2].

23.     The Defendants in this lawsuit include Galveston County and Galveston County Sheriff Henry Trochesset, Mary Johnson, (the "County Defendants") Boon-Chapman Benefit Administrators Inc. ("Boon Chapman"), Soluta, Inc., Soluta Health, Inc. ("Soluta"), Kathy White a/k/a Kathy Jean Jordan ("Kathy White"), Gary Beach, Garry Killyon, and Kimberly Boykins, John Doe Policymakers 1-25, John Doe deputies jailers 1-25 and Doe medical providers 1-25, acting under and in their individual capacities. [Dkt. 1 at 2].

24.     Plaintiffs alleged the following claims: (1) Medical Negligence pursuant to Chapter 74 of the Texas Healthcare Liability Act; (2) Wrongful Death and Survivorship Action pursuant to Texas Wrongful Death and Survival Statute, Tex. Civ. Rem. Code 71.001-71.012 and 71.021; (3) Violations of the Eighth Amendment prohibition against cruel and unusual punishment pursuant to 42 U.S.C. § 1983; (4) Violations of 42 U.S.C. § 1985; and (5) Supervisor Liability. [Dkt. 1 at 37–42 ¶¶ 161–92] and a *Monell* claim pursuant to 42 U.S.C. Section 1983 and for reasonable attorneys' fees as part of the costs under 42 U.S.C § 1988.

25.     On November 22, 2019, Defendants Galveston County and Sheriff Trochesset filed an opposed motion for summary judgment pursuant to the Federal Rules of Civil Procedure Rule 56. [Dkt. 48].

26.    On December 13, 2019, Plaintiffs filed its agreed motion to dismiss claims against

defendant, Alexis Ensley.

27.    The Plaintiffs file this response in opposition to Defendants' summary judgment

motion.

## UNDISPUTED FACTS

28.    Jorge Cortez was in custody of the Galveston County Jail awaiting transport to a

rehabilitation facility. [*See* Ex. C - Jail Medical Records].

29.    Sheriff Trochesset was the elected Sheriff of Galveston in May 2017, responsible

for the care and custody of the inmates in the Galveston County jail, specifically medical

care. [*See* Ex. H, Sheriff Trochesset Video Deposition].

30.    Boon Chapman and its subsidiary Soluta Health operated the medical care contract

at the Galveston County jail in May 2017, while M. Cortez was in custody.

31.    Kathy White has a federal felony conviction for drug possession with intent to

distribute, and a conviction for Driving While Intoxicated. Despite her convictions, Boon

Chapman has employed White in contradiction to its policy against its employees to

socialize with or even reside with a person with a known criminal history.

> • No employee, including independent contractors, shall socialize with or reside with a person who has a known criminal history or who is known to have been or who is engaging in criminal activity. In the event that such person is a member of the employee's family, the employee shall notify the Health Service Administrator, who will notify jail administration, which may at their discretion, permit the association if it will not adversely affect the security of the department.

32.     Kathy White, RN first worked in the Galveston County jail's medical department under Corizon, in 2007, until the contract with Galveston County changed to ConMed. She worked as the director of nursing ("DON") in the Galveston County jail for medical contractor ConMed until when she was terminated and in 2013. She then went on to work as the Health Services Administrator ("HSA") for Boon Chapman in the Galveston County Jail[1] from 2013.

33.     There have been *eight* documented deaths while in custody of the Galveston County jail after demonstrating a serious medical need and noted to be critical when outside care was sought while Trochesset was sheriff. [*See* Ex. J, custodial death reports].

34.     There have been *nineteen* documented deaths while in custody of the Galveston County jail after demonstrating a serious medical need and noted to be critical when outside care was sought while White has worked in jail medical as either a DON of HSA. [See Ex. J, custodial death reports] in the previous ten years that she worked in the Galveston County Jail.

35.     Compared to the neighboring Brazoria County jail where there have been *eight and* eleven in Hidalgo County in the past ten years from 2007 to 2017, [See Ex. X-Brazoria Co. and Hidalgo Co custodial death reports]

36.     Including the death of Jesse Jacobs just over two years before Jorge Cortez's death, where he was not transported for emergency medical care until he was found

---

[1] The Health Services Administrator is responsible for monitoring healthcare services and the availability of the healthcare staff. See. Ex. V pg. BOON & CHAPMAN 000020

unresponsive in his jail cell after suffering seven seizures. [See Ex. J Galveston County custodial death reports].

37.     Another inmate's unborn child was not documented as a custodial death that occurred on February 28, 2017, for unknown reasons.  The unborn child's mother was forced to wait hours to be transported to the hospital while she hemorrhaged severely while pregnant, she did not receive prenatal doctor visits, nor care. [See. Ex. J-Denise Pope Declaration].

38.     Jorge Cortez's death was not documented as a custodial death since he had been released from custody at the request of Kathy White while on his deathbed, at UTMB. In an effort to save the cost of his medical care in the hospital.

39.     Kathy White held a supervisory role either as a DON or HSA in the Galveston jail during the time of each death that occurred in the Galveston County jail from 2007 until present. [*See* Ex. V-Health Services Policy & Procedures Manual Galveston County Jail]

**The Galveston County Medical Team consists of:**

Health Services Administrator: The responsible health authority for the contract site, responsible for oversight of medical unit to include access to care and quality.

Site Supervising Physician: A physician (MD or DO) designated as the final clinical authority at site.

40.     Kathy White was responsible for creating the written jail medical policies for the Galveston County jail, in 2017 while Jorge Cortez was in custody.

41.     Sheriff Trochesset adopted the policy of the medical contractors and implemented the policies within the jail that was posed by the contractor's policymaker, Kathy White. [*See* Ex. F-Kathy White deposition].

42.     Mr Cortez entered the jail seeming healthy, weighing 160 pounds, with only health complaint. [*See* Ex. Q–Deposition of Alexis Ensley, TS: 40:07–40:30].

43.     In 2017, the inmate sick call requests collected throughout the day were not entered until the overnight nurse entered the request. [*See* Ex. F- Kathy White deposition, TS:41:21-43:50].

44.     There was an official policy and practice to not enter request for medical care until the night nurse came on duty and allowing a 48 hour window to respond thereafter causing a delay in medical care to inmates. [*See*. Ex. F–Dr. Kathy White Depo, TS: 27:30–29:11; 41:21–43:50].

45.     Each week on Wednesdays, Galveston County Jail has an X-ray technician available in the jail weekly on Wednesdays capable of scanning a patient.  [*See* Ex. L - Dr. Killyon Depo Pg. 28 : Ln 16–25; pg. 29 : Ln 1–15].

46.     Dr. Killyon can order a patient x-ray without any prior approval required. [*See*. Ex. L–Dr. Killyon Depo Pg. 149 : Ln 21–25; Pg. 150 : Ln 1–15].

47.     On each Wednesday after Mr. Cortez complained of mesothelioma symptoms (e.g., April 12, 2017, April 19, 2017, April 26, 2017, May 3, 2017, May 10, 2017, May

17, 2017, May 24, 2017, and May 31, 2017), there were missed opportunities to perform an X-Ray exam on Mr. Cortez.

48.     Galveston County Jail has the capability to perform X-rays, but failed to do so in the case of Mr. Cortez which would have discovered the pleural effusion. [*See* Ex. B–Aff. of Dr. Lloyd].

49.     Within moments of being taken to UTMB, a chest X-ray was performed that allowed the UTMB physician to diagnose the pleural fluid's presence. [*See* Ex. E–UTMB Records]

50.     Mr. Cortez was never offered the opportunity to get any x-rays done during his time at the Galveston County Jail.

51.     Killyon testified at his deposition:

Q. And now the 23rd was actually on a Tuesday. And it looks like on the 22nd you saw him, which would have been a Monday. Okay. So the 22nd you would not 24 have been there (referring to the Galveston County Jail)?

A. True.
Q. And so the 24th is when the -- would have been the next time you would have been there?
A. Yes.
Q. Do you know why you didn't see him on the morning of the 24th?
A. No.
Q. Okay. And what about on May 26th, the Friday?
A. Why I didn't see him?
Q. Yes.
A. I -- I don't know.

52.     The county engaged in…
17 Q. Okay. He asked for a bottom bunk a few times,
18 correct?

18

19 A. From the chart I saw that he requested it.
20 Q. And he was denied a bottom bunk over and over.
21 Did you see that? As well.
22 A. Yes, I did. **(**See  Ex. L Killyon Deposition pg 83-84 ln...21)

53.     Mr. Cortez suffered from flu-like symptoms but was never evaluated or treated for

the flu.

54.     Galveston County engaged in substandard record keeping, particularly in regards

to  which  medical  staff  had  access  to  enter  medical  information  into  their  Electronic

Medical Records ("EMR") system. (*See* Ex. L–Killyon Deposition pg 132, ln 2-7)

2 Q. -- and it shows on that particular row her
3 entry. That's not your entry, is it?
4 A. I don't believe it is.
5 Q. Okay. So if you don't put on entries why
6 would -- why would you have been the user?
7 A. I have no idea.

55.     The protocol after an inmate is booked into custody is that there are restrictions on

allowing medical employees to call 911. The employees at the Galveston County Jail

must call a "provider" (HSA, doctor or nurse practitioner) employed by Soluta Health

before calling 911. [*See* Ex. Q- Alexis Ensley Deposition]

56.     However, before an inmate is booked into the jail, a medical employee can call

911  without  restrictions  or  prior  approval  from  a  provider  (HSA,  doctor,  or  nurse

practitioner).  [*See* Ex. Q- Alexis Ensley Deposition].

57.     Upon admittance to UTMB on May 31, 2017, Mr Cortez had four liters of massive

right pleural effusion–an amount that does not build-up in a course of two days. [*See* Ex.

–UTMB Medical Records].

58.     Killyon, a plastic surgeon, never worked as a primary care provider, oncologist, or pulmonologist. [*See* Ex. L–Killyon Deposition].

59.     Killyon never received any additional training and had only worked as a plastic surgeon, who was under Texas Medical board disciplinary orders at the time he was responsible for Mr. Cortez's treatment. [*See* Ex. I–Medical Board Orders; Ex. L–Killyon Deposition].

60.     Dr. Garry Killyon is a supervisor but is not supervised as a physician. [Ex. B-Dr. Killyon deposition Pg. 25: Ln 20-25;  Pg. 26: Ln 1-2].Physician Dr. Teresa Becker who was tasked with the responsibility of evaluating Dr. Killyon was also under Texas Medical Board disciplinary orders after she denied and delayed medical care to a Galveston County jail inmate,  Jesse Jacobs, in 2015. [*See* Ex. I–Texas Medical Board Order].

61.     The medical records are unreliable and inaccurate. Dr. Killyon testified that the entries made under his name relating to Mr. Cortez's vital sign on May 31, 2017, were not made by him nor did he direct the entry by others of any vital signs entered. LVN Boykins indicated in the records that she weighed Mr. Cortez but the video contradicts the entry, since he was never placed on the scale. [*See* Ex. L–Killyon Deposition; Ex. C–Jail Medical Records; and Ex. R–Jail clinic video-Boykins 05292017].

62.     The physician at Boon Chapman relies on the examination by the LVNs to determine whether to see a patient.

63.     Licensed Vocational Nurses are not qualified to perform examinations according to the Texas Occupational code, nurses with this qualification are not trained to diagnose patients or do procedures. Rather, they are qualified to assess a patient's situation and report on the same to the Physician. Tex. Occ. Code § 301.002 (5) (A-F).

64.     On May 22, 2017, Boykins testified that she examined Mr. Cortez for his complaints of shortness of breath; however, Mr. Cortez's difficulty breathing complaints were allegedly not reported to Dr. Killyon. [*See* Ex. L- Dr. Killyon]

65.     An examination never occurred.

66.     Killyon admits that to have fluid on the lungs , pleural effusion, is a serious medical condition. [*See* Ex. L- Dr Killion Deposition Pg165: Ln 1-25]

67.     On May 29, 2017, Boykins testified that she again examined Mr. Cortez for his complaints of  difficulty breathing. And exam that was wholly inadequate [*See* Ex. B-Dr. Lloyd Affidavit]

68.     Mr. Cortez filed a grievance complaining that the medical department was failing to treat him and ignoring his serious medical needs. [*See* Ex U. Grievance letter and response]

## DISPUTED FACTS

69.     Mr. Cortez was healthy upon his intake on April 7, 2017. [*See* Ex. Q, Alexis Ensley, TS: 40: 07-40:30].

70.     Mr. Cortez should have been offered some form of cancer treatment regardless of his chances of survival. [*See* Ex. B-Dr. Lloyd Affidavit]

71.     Mr. Cortez's symptoms of mesothelioma, which included dizziness; severe pain in the back, chest, and side; shortness of breath; weight loss; inability to walk significant distances; cough and fever went untreated for over the two months he spent in the custody of Galveston County Jail.

72.     Galveston County has a policy and practice of delaying medical care for patients in need of medical care.

73.     Kathy White the Health Service Administrator was a medical supervisor of the medical personnel when Mr.  Cortez was in custody. [*see* Ex. Q, deposition of Alexis Ensley, TS: 39:06-39:43].

74.     Sheriff Trochesset is the county policymaker with respect to policies and procedures in the Galveston County Jail, namely medical services to inmates.

75.     Sheriff Trochesset and Kathy White both admit to not supervising or training the medical department.

76.     Galveston County further has a policy it adopted from Boone-Chapman of delaying and denying the transport of inmates to the hospital until the inmates medical condition is critical, to avoid paying the cost, and wait for potential reimbursement. In May 2017, Trochesset was aware of  the policy and discreetly sanctioned, approved, and

knowingly consented to the  unconstitutional conduct of  denying and delaying medical care by his medical contractors.

77.    In the past  five years, each inmate that has been transported to the hospital was only transported after they became critical.

78.     On June 27, 2013, Arthur Lee Linear, an inmate at the Galveston County Jail, died after complaints of breathing difficulty, but was only transported by Soluta after becoming critical and obvious medical care. [*See* Ex. J–Custodial Death Reports & inmate records].

79.    On March 15, 2015, Jesse Clayton Jacobs, an inmate at the Galveston County Jail, died because Soluta failed to provide obvious medical care after Soluta refuse his physician prescribed medication resulting in grand mal seizures, organ failure and his death. [*See* Ex. J–Custodial Death Reports & inmate records].

80.    On November 15, 2017, Jerry Louise Biggers-Hill, an inmate at the Galveston County Jail, died because Soluta failed to provide obvious medical care. [*See* Ex. J–Custodial Death Reports & inmate records].

81.    On December 22, 2017, Barry Edwards Phillips, an inmate at the Galveston County Jail, died because Soluta failed to provide obvious medical care, when he complained of breathing problems. [*See* Ex. J–Custodial Death Reports & inmate medical records].

82.     On February 28, 2016, Denise Pope's unborn child died while Mrs. Pope, an inmate at the Galveston County Jail, experienced extreme pain and suffering because Soluta was understaffed and delayed in providing obvious medical care. [*See* Ex. J–Custodial Death Reports & inmate records].

83.     Mr Cortez died after presenting to the emergency department at UTMB with a massive right pleural effusion the moment after arriving at UTMB emergency department, four liters of fluid in his chest cavity, arising from Galveston County's failure to address his medical complaints, particularly his complaints of difficulty breathing, chest pain, shoulder pain, and back pain.

84.     As a result of the delay, it was necessary that UTMB drain four liters immediately to allow him to breathe, although only 1.5 liters  of fluid is recommended. The required four liter drainage resulted in repaid lung re-expansion and leading to immediate respiratory failure.

## STATEMENT OF ISSUES

85.     Whether Plaintiffs' medical malpractice wrongful death claims are barred due to Mr. Cortez had a significantly lower than 50% chance of surviving his pre-existing mesothelioma disease.

86.     Whether Plaintiffs' constitutional wrongful death claims are barred due to Mr. Cortez had a significantly lower than 50% chance of surviving his pre-existing mesothelioma disease.

87.     Whether Defendants' actions of delaying adequate medical care to Mr. Cortez was objectively reasonable.

88.     Whether Defendants were deliberately indifferent to Mr. Cortez's serious medical needs in their actions of delaying adequate medical care to Mr. Cortez.

89.     Whether Defendants' actions of denying adequate medical care to Mr. Cortez was objectively reasonable.

90.     Whether Defendants were deliberately indifferent to Mr. Cortez's serious medical needs in their actions of denying adequate medical care to Mr. Cortez

91.     Whether the evidence demonstrates that failing to address and treat Mr. Cortez's complaints of shortness of breath—a serious medical need—and then send him out for emergency medical care violated the Fourth Amendment to defeat a qualified-immunity claim.

92.     Whether Galveston County has a policy and practice of denying and delaying medical care of its inmates.

### STANDARD OF REVIEW

93.     Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper against a party who fails to make a sufficient showing of the existence of an element essential to the party's case and on which that party bears the burden at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant bears the initial burden of "informing the district court of the basis for its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *see also Martinez v. Schlumber, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

94.     If the movant meets its burden, the burden then shifts to the nonmovant to "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996) (citing *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995); *Little*, 37 F.3d at 1075). The nonmovant can support its claims by showing the existence of a genuine issue concerning each element of its claim in the record and by articulating the specific evidence that supports its claims. *See Stults*, 76 F.3d at 656 (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)); *see also Am. Eagle Airlines, Inc. v. Air Line Pilots Assn, Intern.*, 343 F.3d 401, 405 (5th Cir. 2003). Conclusory allegations or unsubstantiated assertions are insufficient to satisfy the non movant's burden. *See Little*, 37 F.3d at 1075.

95.     "A fact is material only if its resolution would affect the outcome of the action, . . . and an issue is genuine only 'if the evidence is sufficient for a reasonable jury to return a verdict for the [nonmovant].'" *Wiley v. State Farm Fire and Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009) (internal citations omitted). When determining whether a genuine issue of material fact has been established, a reviewing court is required to construe "all facts and inferences . . . in the light most favorable to the [nonmovant]." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citing *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003)). Likewise, all "factual controversies [are to be resolved] in favor of the [nonmovant], but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."

*Boudreaux*, 402 F.3d at 540 (citing *Little*, 37 F.3d at 1075 (emphasis omitted)). Thus, "[t]he appropriate inquiry [on summary judgment] is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

## SUMMARY OF ARGUMENT

96.     Summary judgment is not appropriate on Mr. Cortez's claims. Defendants were deliberately indifferent to Mr. Cortez's serious medical needs in their actions of delaying and denying adequate medical care to Mr. Cortez because the Defendants were subjectively aware that an inmate faced a substantial risk of serious harm and they disregarded that risk by failing to take reasonable measures to prevent the harm from occurring. Moreover, Defendants' acts of delaying and denying adequate medical care to Mr. Cortez were not objectively reasonable.

## ARGUMENTS & AUTHORITIES

### *Plaintiffs' constitutional wrongful death claims are not barred due to Mr. Cortez's chance of surviving his pre-existing condition was less than 50% and it is irrelevant to 42 U.S.C § 1983 claims under the constitution for inadequate medical care*

97.     The "less than 50% chance of survival" doctrine has been used to bar recovery in medical malpractice cases where a plaintiff seeks recovery for a wrongful death although

28

the decedent only had less than a 50% chance of survival from the pre-existing condition. *See, e.g.*, *Martinez v. Porta*, 598 F. Supp. 2d 807, 816 (N.D. Tex. 2009).

98.     Plaintiffs' claims against the County Defendants and medical defendants are pursuant to 42 U.S.C. § 1983 for inadequate medical care resulting in the death of Jorge Cortez.

99.     Plaintiffs do not allege medical malpractice or any negligence against the County Defendants.

100.   Neither Defendant cited authority that the "50% chance of survival" doctrine applies to 42 U.S.C. § 1983  claims for inadequate medical care, based on the delay and denial of medical care to Jorge Cortez.

101.   *In Montano v. Orange Cty.*, Tex., 842 F.3d 865, 882 (5th Cir. 2016), the Fifth Circuit determined the issue was whether the county's unconstitutional treatment was a substantial factor leading to Mr. Montano's death, without which his death would not have occurred.

102.   Mr. Cortez would not have died due to respiratory failure, also a complication from mesothelioma, after he experienced rapid lung re-expansion due to the emergent need to drain the 4 liters that accumulated in his chest cavity if his medical need complaints of shortness of breath were not ignored by Galveston County Jail's medical department.

103.   Although there is no federal wrongful death statute and the federal claims that seek recovery for wrongful death borrow from the state's wrongful death statute, it does not borrow specifically from the medical malpractice statute.

104.   The 50% chance of survival rule is not applicable merely because a tort victim happens to have a terminal illness absent some relationship between that illness and the alleged malpractice that results in injury or death.

105.   The Texas Supreme Court did not hold, however, that once a person is diagnosed with a terminal illness, they no longer enjoy the protection of Texas tort law as to harms that they may suffer other than the ultimate harm, such as death and loss of chance of survival. The limitation on Kramer has been recognized by state appellate courts. See *Hodgkins v. Bryan*, 99 S.W.3d 669, 675 (Tex. App.–Houston [14th Dist.] 2003, no pet.); *Parrott v. Caskey*, 873 S.W.2d 142, 150 (Tex. App.–Beaumont 1994, no writ). *Escalante v. Rowan,* 251 S.W.3d 720 (Tex. App.—Houston [14th Dist.] 2008)

106.   This case is distinguishable from *Hodgkins*, since Rowan and Niese alleged pre-death injuries other than loss of chance of survival. In her petition, Rowan alleged that the defendants negligently failed to diagnose her recurrence of cancer in September 2002 and May 2003 and that this negligence caused Rowan to undergo medical procedures and pay the medical expenses that would have been unnecessary if defendants had not negligently failed to diagnose the recurrence of her cancer. Specifically, Rowan has sued for her enduring "otherwise unnecessary and additional

medical procedures, otherwise unnecessary and additional medical expenses, loss of job and associated benefits, physical pain and suffering, loss of consortium, mental anguish, emotional stress,  and loss of enjoyment of life."

107.    Cortez plaintiffs sued for civil rights violations as well as Chapter 74 state law claims.

108.    Unlike the plaintiffs in Kramer, Plaintiffs here are not seeking recovery for an alleged loss of chance of cure or loss of chance of survival in their claims. 858 S.W.2d 397, 400 (Tex. 1993).

***The Survival Statute***

109.    In addition, the Survival Statute authorizes recovery of all damages which the injured party, if living, could recover. The Act provides in part as follows: HN5 (a) A cause of action for personal injury to the health, reputation, or person of an injured person does not abate because of the death of the injured person or because of the death of a person liable for the injury.

110.    The survival statute authorizes recovery of all damages which the injured party, if living, could recover. The Act provides in part as follows:

A cause of action for personal injury to the health, reputation, or person of an injured person does not abate because of the death of the injured person  or because of the death of a person liable for the injury. *Parrott v. Caskey*, 873 S.W.2d at 142. [2]

---

[2] We see no reason why appellants should not be able to pursue an action under the Survival Statute for personal injuries suffered by decedent from the date of alleged negligence of Drs. Read and Caskey to the date that Mrs. Parrott was finally properly medically diagnosed.

***Plaintiff Can Prove Causation in the Wrongful Death Claim, thus Plaintiff are Entitled to Relief for the Negligent Acts of Defendants.***

> The "50% or less chance of survival" doctrine does not apply to a death that is the result of an injury caused by negligence not involving the underlying disease

111.    In a medical malpractice case in Texas, plaintiffs are required to present evidence establishing a "reasonable medical probability" or a "reasonable probability" that their injuries were caused by the defendants, "meaning simply that it is more likely than not that the ultimate harm or condition resulted from such negligence." *Smith v. Christus Saint Michaels Health Sys.*, 496 F. App'x 468, 470 (5th Cir. 2012) citing *Young v. Mem'l Hermann Hosp. Sys.,* 573 F.3d 233, 235 (5th Cir. 2009)

112.    Causation has two components: cause-in-fact and foreseeability. *Id.* citing Travis v. City of Mesquite, 830 S.W.2d 94, 98 (Tex. 1992). Cause-in-fact is shown when, "by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." *Smith v. Christus Saint Michaels Health Sys.*, 496 F. App'x 468, 470 (5th Cir. 2012) citing *Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 399-400 (Tex. 1993). 'Foreseeability' means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others. *Travis,* 830 S.W.2d at 98. *Smith v. Christus Saint Michaels Health Sys.*, 496 F. Appx 468, 470 (5th Cir. 2012).

113.    In *Smith v. Christus*, The 5th Circuit Court of Appeals reject the idea that "medical practitioners would be immunized from any negligence in every instance where a patient has more than even chance of dying, regardless of the degree or kind of negligence or how and when the patient dies." *Smith v. Christus Saint Michaels Health Sys.*, 496 F. Appx 468, 472 (5th Cir. 2012). In that case, the plaintiff brought a wrongful death claim against defendant Christus Saint Michaels System (Christus) for medical negligence when plaintiff passed away as a result of negligence acts or omission by the defendant. *Id.* Austin smith was a 71-year-old man who had colorectal cancer and was being treated at Christus for the cancer, as part of his treatment, Christus had a catheter implanted in his right internal jugular vein because there was evidence that he had a history of falling, measures were taken to ensure that whenever Smith gets out of bed that the nurses on staff would be alerted through a bed alarm and be on notice to check on the patient. *Id. At 469*. On November 24, 2008 while Smith was staying at the hospital, Smith's bed alarm was not turned on, so when Smith got out of bed and fell down the catheter slipped out of the vein and Mr. Smith bled out on the floor that night because no one coming to his aid on time. *Id.*   In the Christus case, the 5th Circuit Court of Appeals found that lost chance was not applicable because although there was evidence that Mr. Smith did not have a greater than 50% chance of surviving his cancer at the time of the negligence, instead Mr. Smith death was as a result of negligent acts wholly apart from Smith's cancer and TTP treatment. *Id at 472.*

114.    In the instant case, Plaintiffs are not claiming that a misdiagnosis of Jorge Cortez condition caused his death, neither are we claiming that had his cancer been diagnosed on May 22nd 2017 that he would have had a greater than 50% chance of surviving the cancer. Instead plaintiffs assert that like in the Christus case, it was a separate negligent act caused by Boon & Chapman subsidiary Soluta Health as well as constitutional violations that caused Mr. Cortez Ultimate Death. Both expert witnesses agree that Mr. Cortez died as a result of the complications of Mesothelioma and not necessarily the disease itself, and the autopsy report supports this. (See Ex. B-Dr. Lloyd Affidavit, Ex. A-Autopsy and County Defendant Ex. E Stupka Affidavit p. 3 ¶¶ 8.)

115.    Namely the complication that caused Mr. Cortez death was Pleural Malignancy. The specific complication of pleural malignancy that occurred in Mr. Cortez case is an Acute Respiratory Distress Syndrome (ARDS). [Ex. A-Autopsy p. 5]. According to defendant's expert, ARDS causes significant injury to the lungs that may result in respiratory failure. [Ex. M- Stupka Deposition p. 17-19; Ln 1-25].

116.    It is the plaintiffs contention that in Mr. Cortez case, had the medical staff properly assessed Mr. Cortez on May 22nd, 23rd , 24th, 25th or May 29th as he consistently complained of shortness of breath and pain in his side, they would have been able to correctly identify that he had an ongoing serious medical need and could have acted to get his lungs drained in an efficient manner as pointed out by both expert witnesses. [Ex. M-Dr. Stupka Depo. P. 18; Def. Boon-Chapman Defendant Ex. C. p. 89]. As cited by

plaintiff's expert witness in his affidavit the lack of training to staff by Boon-Chapman (Soluta Health) played a role in Mr. Cortez death, because had Kimberly Boykins, the nurse seeing Mr. Cortez on the 29th completed a thorough examination of his lungs she would have found that he had problems with his breathing. [Ex. B-Dr. Lloyd Affidavit]. Furthermore, the Boon-Chapman was negligent through the act of the nursing staff who failed to see or treat Mr. Cortez for the six days after the 23rd as he complained of shortness of breath and pain as he begged to see a healthcare provider. [Ex. D-Sick call Request].

117.    Just like in the Christus case, Mr. Cortez death is a result of the medical staff ignoring his serious medical condition, failing to appreciate those serious medical conditions and refusing to treat him for his serious medical condition that he repeatedly complained of, as a result he underwent an emergency medical procedures at UTMB and that ultimately lead to his death. [Ex. B-Dr. Lloyd Affidavit]. So in the Christus case, Smith there was an underappreciation for the risks that Mr. Smith health situation presented to him, here there is an underappreciation of the risks that Mr. Cortez health situation presented to him. In Christus, Smith died as a result of the medical staff not following their own policy of turning on the bed alarm to know when Smith got out his of bed. Here, Mr. Cortez passed away due to the ARDS caused by the defendants, requiring UTMB to rapidly drain 4L of fluid from his lung because the medical staff at

the County jail allowed the fluid to build up on his lungs to the point that it had reached

a critical point that such drastic measures had to be taken. [Ex. B-Dr. Lloyd Affidavit]

118.   Finally the foreseeability prong is resolved in this case because just like in the

Christus case where the 5th Circuit states that "[foreseeability] does not require that a

person anticipate the precise manner in which injury will occur once he has created a

dangerous situation through his negligence." *Smith v. Christus Saint Michaels Health

Sys.*, 496 F. Appx 468, 473 (5th Cir. 2012) citing T*ravis,* 830 S.W.2d at 98; *see Walker

v. Harris,* 924 S.W.2d 375, 377 (Tex. 1996). "Foreseeability requires only that the

general danger, not the exact sequence of events that produced the harm, be

foreseeable." *Id.* In the Christus case, the foreseeable danger was that failing to turn on

Mr. Smith's bed alarm could lead to him getting out of his bed and injury or harm

resulting. In this current case, any medical profession should know that injury or harm

may result from a patient who is constantly complaining of shortness of breath and

severe pain, any number of scenarios may result from this such as respiratory failure,

suffocation or any of the many respiratory issues.

119.   It is true that the Chapter 74 medical negligence claims would bar recovery if Mr.

Cortez only had less than 50% chance of survival unless the death was a result of an

injury caused by negligence not involving the underlying disease.

120.   In *Smith*, however, the plaintiffs brought wrongful death claims on their behalf and

of the Estate of Austin Smith. Smith was a 71-year old man suffering from recurrent

colorectal cancer was suffering from a rare form of deadly blood disorder thrombotic thrombocytopenic purpura (TTP and colorectal cancer), and was in the hospital for treatment of the cancer.

121.    The defendants in that case failed to monitor the decedent and/or to set his bed alarm. He died because he bled to death as a result of the hospital's alleged negligent failure to provide a safe environment through the use of a bed alarm or more frequent monitoring, which ultimately lead to his death.

122.    The defendants were not afforded the benefit of the less than 50% chance of survival defense because the decedent was not injured because his pre-existing condition was misdiagnosed or because he received substandard care for the condition that would have killed him anyway, and plaintiffs were not seeking recovery for an alleged loss of chance to be cured from cancer.

123.    Much like in *Smith*, the Plaintiffs here also do not assert Mr. Cortez was injured because his pre-existing mesothelioma was misdiagnosed or because he received substandard care for his mesothelioma condition. Plaintiffs are not seeking recovery for an alleged loss of chance to be cured from cancer. Rather, the Plaintiffs are alleging that Mr. Cortez did not get treatment for breathing complaints, the pleural effusion which in fact was present and the cause of his difficulty breathing complaints.

### *Defendants' Delay and Denial of Adequate Medical Care to Mr. Cortez*

<u>Defendants were deliberately indifferent to Mr. Cortez's serious medical needs in their actions of delaying adequate medical care to Mr. Cortez</u>

124.    "[D]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference [that] results in substantial harm." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). Under the Eighth Amendment of the United States Constitution, a jail official is prohibited from inflicting cruel and unusual punishment. U.S. Const. amend. VIII. A jail official violates the Eighth Amendment's prohibition against cruel and unusual punishment when his conduct demonstrates deliberate indifference to an inmate's serious medical needs, constituting an unnecessary and wanton infliction of pain. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006). The mere delay of medical care for an inmate can constitute an Eighth Amendment violation, but only if the plaintiff establishes that there has been deliberate indifference that results in substantial harm. *Id*. "The Supreme Court defined deliberate indifference as requiring a showing that the official was subjectively aware that an inmate faced a substantial risk of serious harm and [he] disregarded that risk by failing to take reasonable measures to abate it." *King v. Brooks*, 68 F.3d 471 (5th Cir. 1995) (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). Deliberate indifference was found when prison officials allowed a one hour and forty-two minutes delay in sending a prisoner to the hospital after the

prisoners heat stroke condition requires immediate medical attention, therefore surviving a summary judgment motion based on qualified immunity. *Austin v. Johnson* 328 F.3d 204, 210 (5th Cir. 2006).

125.   Sheriff Trochesset is responsible for (a) staying informed about day-to-day operations in the jail and is visible and available to assist when necessary; (b)  monitoring compliance with policies, standards, and legal requirements through the establishment of a systematic internal inspection and review process; (c) supporting and facilitates the jail administrator's efforts to redirect underperformers and address misconduct of jail staff and contractors; and (d) monitoring the jail administrator's performance through regular reviews and quality assessment.

126.   Galveston County is required to fulfill certain duties as well. Those duties include having Galveston County's medical contractor examine inmates who appear to be injured or in need of immediate medical attention; (b) have its medical contractor provide only such medical attention to inmates it is contractually obligated to provide to inmates; (c) perform all activities on and with City inmates in accordance with current and future County Jail policies and procedures that are in effect for County inmates; (d) provide necessary transportation and security for inmates to a medical care facility and arrange for such medical care as is required if an inmate tendered for processing is examined for medical, mental or dental reasons and is ineligible for such care because it is beyond the care which the County's medical contractor can or is contractually obligated to render;

(e) provide necessary transportation and security for inmates to a medical care facility and arrange for such medical or mental care as is required if a person, once processed, develops a serious or emergency medical or mental condition that is beyond the care which the County's medical contractor can render or is contractually obligated to render; and (f) provide all necessary transportation for inmates regardless of the reason for such transportation (e.g. medical, transfer to Municipal Court, etc.) and regardless of whether the services of a third party are required (e.g., ambulance).[3]

127. First, Defendants, Galveston County's medical personnel employed by Soluta Health were deliberately indifferent to Mr. Cortez serious medical need because they refused to immediately address his initial complaints about dizziness, instead ordered and performed a rectal/prostate exam with nurse practitioner, Carl Hart.

128. Second, Defendants, Galveston County were deliberately indifferent because they refused to make a reasonable accommodation to reassign Mr. Cortez to a bottom bed bunk upon notification of his dizzy spells. Mr. Cortez first request of a bottom bunk bed was made on April 11, 2017. Mr Cortez made five other written request for a bottom bunk bed and made several oral requests for a bottom bunk bed. Mr Cortez, while suffering from severe pain had to wait 41 days before his request was finally granted. Had they assigned Mr. Cortez to a bottom bunk bed, he would not have been required to climb to the top bunk as he was dizzy, weak and suffering from a serious medical

---

[3] https://www.galvestontx.gov/AgendaCenter/ViewFile/Item/4148?fileID=13142

condition of shortness of breath, fluid on his lungs, and mesothelioma. In addition, he would not have fallen from the bed and injured himself.

129.   Third, Defendants were deliberately indifferent because they refused to require Soluta to individually assess Mr. Cortez's health and identify the cause of his dizziness, further delaying actual access to medical care. Instead, the medical staff provided him with Ibuprofen pills.

130.   Finally, Defendants were deliberately indifferent because they waited so long to even address Mr. Cortez's serious medical needs and avoid preventable injuries (i.e., the severe pain, and shortness of breath, among other things) before he died.

131.   Defendants' conduct of ignoring Mr. Cortez's serious medical needs was the impetus for his injuries and resulting death. Defendants were subjectively and actually aware that Mr. Cortez faced a substantial risk of serious harm because Mr. Cortez, his inmates, his inmates' family members, his own family members, and the jail staff all observed his dizzy and weakened condition and asked for a bunk reassignment to prevent serious injuries from a fall. Rather than allowing and/or reassigning him to a bottom bunk bed, the jail staff ordered him to move back to his top-bunk-bed assignment. Thus, Defendants disregarded Mr. Cortez's risk of falling by failing to take reasonable measures to avoid the foreseeable injuries sustained by him.

132.   There are some bureaucratic means of the jail staff and/or Soluta in obtaining approval from Sheriff Trochesset for a bunk reassignment. Moreover, there are also

policies or procedures to notify Sheriff Trochesset of when an ambulance is called to refer an inmate to an outside medical facility. Failure to yield to and/or take action of these certain incidents, such as in Mr. Cortez's case, is willful and blatant ignorance to known issues occuring at Galveston County Jail.

### *Defendants were deliberately indifferent to Mr. Cortez's serious medical needs in their actions of denying adequate medical care to Mr. Cortez*

133.   The averments of the preceding paragraphs are incorporated into this section of the Plaintiffs' Response by reference.

134.   The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). As a result of the government's obligation, an inmate must solely rely on jail staff to treat his medical needs. *Id*. Failure to provide adequate medical care to an inmate may cause physical "torture or a lingering death" to an inmate. *Id*. Although a plaintiff cannot allege mere negligence in diagnosing or treating medical conditions, the plaintiff can establish the failure to provide adequate medical care by showing "an unnecessary and wanton infliction of pain" or conduct so egregious that it is "repugnant to the conscience of mankind." *Id*. at 105–06. The Fifth Circuit has recognized that deliberate indifference is established if a plaintiff alleges and submits evidence that jail officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any

similar conduct that would clearly evince a wanton disregard for any serious medical needs. *Rogers v. Boatright*, 709 F.3d 403, 410 (5th Cir. 2013); *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

135.   Defendants and the jail staff were fully aware of an excessive risks to Mr. Cortez's health because Mr. Cortez and other inmates complained to them of his dizziness and expressed concern from him falling from the top bunk bed. Moreover, Defendants and the jail staff observed Mr. Cortez's dizzy state and disregarded his risk of falling until he obtained approval for the reassignment by Soluta. Indeed, the jail staff intentionally denied medical treatment because based on the policy requiring approval to comply with a reasonable request to accommodate Mr. Cortez's bunk-assignment request in light of the circumstances. Rather than reassigning him to a bottom bunk bed, Soluta first offered him Ibuprofen pills, and then, after he had fallen from his assigned bunk, reassigned him to a punitive jail cell, even though he had not committed any infractions. At no point in time did Soluta ever personally evaluate and assess Mr. Cortez's medical condition; namely, the source of his dizziness and the cause of his shortness of breath. They did not perform any scans to see how he was physically damaged internally. Had Soluta properly evaluated Mr. Cortez from the time he complained of dizziness, it would have prevented a pattern of neglect caused to Mr. Cortez. In that event, he would have lived months longer.

136.    At Mr. Cortez's first complaint of dizziness, Defendants should have evaluated and treated Mr. Cortez, but did not.

137.    At the remaining complaints of dizziness by Mr. Cortez, his family, other inmates, and their families, Defendants should have evaluated and treated Mr. Cortez, but did not.

138.    After his fall, Defendants should have evaluated and treated Mr. Cortez but, like the other instances, Defendants did not.

139.    Or, in the alternative, Defendants should have referred Mr.Cortez to an outside hospital if the treatment options and necessary care available to Soluta was beyond its scope of medical care. But, of course, Defendants did not do this until after he was so weak that  jail staff had to physically carry him to Soluta for evaluation.

140.    This indifference by the Defendants is one that offends "evolving standards of decency" in violation of the Eighth Amendment's prohibition against cruel and unusual punishment . *Estelle*, 429 U.S. at 106.


*__Defendant Sheriff Trochesset is not entitled to qualified immunity because he was__*
*__personally involved in the unconstitutional treatment of Mr. Cortez as the policymaker,__*
*__and supervisor of the Medical Contractor, Soluta/Boon Chapman, and Defendants'__*
*__misconduct resulting in delaying and denying adequate medical care to Mr. Cortez and__*
*__actions were not objectively reasonable__*


141.    Qualified immunity provides government officials performing discretionary functions with a shield against civil damages liability, so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.

*Gobert*, 463 F.3d at 345. When a defendant moves for summary judgment on the basis of qualified immunity, this Court is required to determine (1) whether the plaintiff has demonstrated a violation of a clearly established federal constitutional or statutory right and (2) whether the official's actions violated that right to the extent that an objectively reasonable person would have known. *See Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014). See also *Ontiveros v. City of Rosenberg, Tex.,* 564 F.3d 379, 382 (5th Cir. 2009); *Flores v. City of Palacios,* 381 F.3d 391, 395 (5th Cir.2004) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir. 1993).

142.    Fifth Circuit has frequently commented in inadequate medical care cases, where "the material facts underlying [an] incident are hotly disputed," only a jury can resolve those disputes. Summary judgment cannot be granted. The sorts of factual disputes in this record are precisely those Courts find preclude summary judgment. *Baulch v. Johns, 70* F.3d 813 (5th Cir. 1995).

143.    Sheriff Trochesst is the final policymaker in Galveston County Jail, as it relates to the jail and medical care of inmates. Sheriff Trochesset implemented the policy of collecting sick calls submitted by inmates during the day and only collecting those sick call requests once at night by the night nurse on duty. Further, policy approved by Sheriff Trochesset is purposely understaffing medical staff on the weekends. [*See Deposition* of Kathy White 41:21–43:50]; [*See Deposition* of Alexis Ensley 36:40–37:45], and failing to address and treat Mr. Cortez's complaints of shortness of breath. These policies

45

unconstitutionally delayed and denied adequate medical care to Mr. Cortez who had to wait days on several occasions in an attempt to see medical staff  in the jail and to ultimately be transported to  a hospital.

144.   It is objectionable unreasonable to actively implement policies where an inmate must wait for days at a time to get some or no medical care for a serious medical need.

145.   In *Brown v. Callahan*, 623 F.3d 249 (5th Cir. 2010), the court held that the test for qualified immunity was not factually demonstrated against the sheriff. Unlike *Brown,* there are facts here that demonstrate Sheriff Trochesset's direct involvement in the creation and implementation of policies and customs that led to the unconstitutional delay and denial of adequate medical care to Mr. Cortez.

146.   Qualified immunity defense protects but the plainly incompetent or those who knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 106 S. Ct. 1092 (1986). By instilling such policies that delays and denies medical care for Mr Cortez and similarly situated inmates, Sheriff Trochesst's approval of such policies as policy maker has met the burden of plainly incompetent.

147.   The actions of Sheriff Trochesset cannot be viewed as justified, since his actions were objectively unreasonable, demonstrate deliberate indifference, and fail to meet the threshold for qualified immunity.

### ***Sheriff Trochesset is personally liable***

148.   Sheriff Trochesset is personally liable for the unconstitutional treatment of Mr. Cortez, as the chief policymaker, and supervisor of the medical contractor, Soluta/Boon Chapman.

149.   A supervisory official may be held personally liable if either (1) he was personally involved in the constitutional deprivation; or (2) a  sufficient causal connection exists between his wrongful conduct and the constitutional violation. *Ibarra v. Harris County*, 243 F. App'x 830, 836 (5th Cir. 2007); *see also Grandstaff v. Borger*, 767 F.2d 161, 169 (5th Cir. 1985). The supervisory official may be held personally liable without overt personal participation in the offensive act if he implemented "a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation. *Cozzo v. Tangipahoa Par. Council-President Gov't*, 279 F.3d 273, 289 (5th Cir. 2002); *see also Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987). In *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992), the Fifth Circuit defined an official policy as:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

150.    As analyzed above in 143 of this response, sheriff Trochesset is the primary

policy maker at Galveston County jail. He implemented and condoned such

policies that led to the violation of Mr. Cortez's constitutional rights.

*Plaintiffs Monell claim against Defendant Galveston County establishes the existence*
*of the unconstitutional policy of delaying and denying adequate medical care.*

151.    The averments of the preceding paragraphs are incorporated into this section of the

Plaintiffs' Response by reference.

152.    Municipalities are liable under section 1983 "when execution of a government's

policy or custom, whether made by its lawmakers or by those whose edicts or acts may

fairly be said to represent official policy, inflicts the injury." *Monell v. New York City*

*Dept. of Social Services*, 436 U.S. 658, 694 (1978)*. Monell* and its progeny are designed

to guard against precisely the kind of municipal acquiescence to officer misconduct as

happened here. *Monell,* 436 U.S. at 691. Where a county fails to provide adequate

medical care causing delays and denial of medical care, a jury may find it liable for a

plaintiff's injuries.

153.    Plaintiff may establish municipal liability under section 1983 by proving that Mr.

Cortez's constitutional rights were violated by an "action pursuant to official municipal

policy" or misconduct so pervasive among non-policymaking employees of the

municipality "as to constitute a 'custom or usage' with the force of law." *Monell*, 436

U.S. at 691. The question is whether the practices of delaying medical care to Mr. Cortez

was committed pursuant to a policy or custom of Galveston County that was the "moving

force" behind the constitutional violations. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694); *James v. Harris County*, 577 F.3d 612, 617-18 (5th Cir. 2009)).

154.    An "official policy" for Monell liability may be shown through "a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Lawson v. Dallas Cnty.*, 286 F.3d 257, 263 (5th Cir. 2002). A cognizable policy for purposes of section 1983 liability may, therefore, be evidenced by customs, "even though such a custom has not received formal approval through the body's official decision making channels." *Milan v. City of San Antonio*, 113 F. App'x 622, 625 (5th Cir. 2004) (quoting *Monell*, 436 U.S. at 691). Moreover, a custom may be shown by proof that "serious incompetence or misbehavior was general or widespread throughout the police force." *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992).

155.    As a consequence, "the existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988). Absent written policy, therefore, Galveston County may be liable if its policymakers condone or otherwise adopt the creation of a custom by knowingly ratifying the illegal or unconstitutional actions of subordinate, non-policymaking employees. *Santibanes v. City of Tomball*,

Tex., 654 F. Supp. 2d 593, 611 (S.D. Tex. 2019) (citing *Turner v. Upton County*, 915 F.2d 133, 136 (5th Cir. 1990)). "A persistent, widespread practice of officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents the municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc).

156.    Finally, though important, it is established that Galveston County's own response to the underlying incident is important *Monell* evidence. Should a jury agree with Plaintiff that Mr. Cortez's rights were violated in the delay and denial of medical care, "a jury could look to the County's inaction in the face of Plaintiff's own allegations of serious police misconduct as evidence of the custom that existed prior to the shooting incident." *Monaco v. City of Camden*, 2008 WL 8738213, at *8-*9 (D. N.J. Apr. 14, 2008); *see also Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) ("If that episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City of Borger. If prior policy had been violated, we would expect to see a different reaction. If what the officers did and failed to do on August 11, 1981 was not acceptable to the police chief, changes would have been

made."). The same is true here when Galveston County delayed and denied proper medical care to Mr. Cortez.

157.   Plaintiff can establish that Defendant Galveston County is liable here because: (1) it had a custom of failing to supervise its employees; (2) it maintained the custom with deliberate indifference to the risk it would result in violations of clearly established constitutional rights; and (3) the custom was the moving force behind the constitutional violation here—the violation of Mr Cortez's right to adequate medical care.

158.   Here, Plaintiffs rightfully alleged that, as a matter of custom and practice, Galveston County and Sheriff Trochesset, as the chief policy maker, allows the medical personnel to structure its treatment of inmates that allows for Fourth and Eight amendment violations and forgoing proper supervision. Medical employees at Galveston County are not allowed to call 911 for an inmate's serious medical needs without first contacting the Doctor, [*See* Ex. Q-Alexis Ensley deposition 29:10], delaying an inmate's access to adequate medical care and acting with deliberate indifference to a serious medical need.

159.   In March 2015, Galveston County denied and delayed medical care to inmate Jesse Jacobs after he complained of a medical need for his  prescribed xanax medication, he suffered severe grand mal seizures, renal failure, vomiting, severe sweating, hallucinations  and only when he was unresponsive did they transport him to a hospital

where ultimately  he died after  the jail deprived him of  his medication. [*See* Ex. J, Other Inmate records] .

160.   In February 2017, Galveston County denied and delayed medical care to pregnant inmate Denise Pope after she complained of severe cramping, hemorrhaging so much she had to use a blanket to absorb the blood after it became too much for sanitary napkins to absorb. She was not transported to a hospital until it was too late she lost her unborn child.  [*See* Ex. J-Pope Declaration]

161.   Mr. Cortez while in serious pain, had to submit a written request to the medical staff in order to be seen. These requests were then retrieved by the night nurse and placed in the medical staff's system; further dealing and denying Mr. Cortez's access to adequate medical care. [*See Deposition* of Kathy White 41:21–43:50].

162.   Mr. Cortez's complaints which included significant pain in his chest and back, cough, shortness of breath, dizziness, throat pain, and inability to walk was left completely untreated due to a written policy that encourages delays in emergency medical care for inmates with serious medical needs. This plainly states a "widespread practice or custom".

163.   The medical providers lack of training to recognize respiratory distress, at best or recognized the need but ignored Mr. Cortez's respiratory distress. Mr. Cortez complained of shortness of breath. They allowed an untrained person to perform examinations that

failed to report the information gained from an assessment to the physician as required by law. *Tex. Occ. Code* § 301.002 (5) (A-F).

164.   The medical defendants at Galveston County Jail implemented a custom and practice of delaying medical care, including emergency medical care until a patient is critical, that was adopted by the county's final policymaker for the jail,  Trochesset, [*see* Ex. O, County deposition; Ex. H, Sheriff deposition], thereby not providing adequate medical care that was the moving force behind the constitutional violation experienced by Mr. Cortez.

165.   Over a course of weeks, Mr. Cortez developed pleural effusion (***four*** liters of fluid between Mr. Cortez's right chest cavity). [*See* Ex. B, *Dr. Lloyd aff* at 4*; def.* Ex. F *Medical examiners report* at 4].

166.   The development of pleural effusion occurred during the time Mr. Cortez spent in the Galveston County Jail and went undiagnosed and untreated by Galveston County's medical contractors.

167.   The complications from pleural mesothelioma that developed, pleural effusion in Mr. Cortez's right chest cavity, causing respiratory failure that led to his death. *Id*.

### *Plaintiff can adequately show causation between acts or omissions by Defendants Galveston County  and the death of Mr. Cortez.*

168.   Galveston County Defendants are responsible for Mr. Cortez's death that occurred on June 23, 2017. The standard of proof on causation is "whether, by a preponderance of

the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." *Montano*, 842 F.3d at 883. "A plaintiff seeking to recover on a wrongful death claim under § 1983 must prove both the alleged constitutional deprivation required by § 1983 and the causal link between the defendant's unconstitutional acts or omissions and the death of the victim, as required by the state's wrongful death statute." *Id*. at 882; *Phillips ex rel. Phillips v. Monroe Cty., Miss.,* 311 F.3d 369, 374 (5th Cir. 2002).

169.    In *Montano,* Montano died of renal failure after spending over four days in the Orange County jail. *Id*. at 881. The Court ultimately held that the County defendants unconstitutional treatment of Montano was a substantial factor in his death. *Id*.

170.    Here, Mr. Cortez was in the custody of Galveston County jail from April 7, 2017 to May 31, 2017. During this time, Mr. Cortez's serious medical need went untreated. Between April 7, 2017  and May 31, 2017, Mr. Cortez complained of severe pain in his shoulder, back, and neck. Mr. Cortez complained of having flu-like symptoms; coughing, dizziness and shortness of breath. Mr. Cortez had to be transported via a wheelchair during his time at Galveston County Jail.

171.    During Mr. Cortez's 2017 stay in Galveston County jail, over four liters of fluid developed between Mr. Cortez's right lung and chest. This serious medical condition went untreated during the time of Mr. Cortez's time in Galveston County Jail.

172.    Defendants' unconstitutional treatment of Mr Cortez in Galveston County jail, more specifically, delaying and denying him of adequate medical care was a substantial factor in Mr. Cortez's death.

### *Plaintiff can establish that Kathy White failed to supervise or train subordinates, thus Kathy White is liable in her individual and official Capacities*

173.    In order to prevail on a failure to supervise or train claim, plaintiffs must demonstrate that (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Sabbie v. Sw. Corr., LLC*, No. 5:17cv113-RWS-CMC, 2019 U.S. Dist. LEXIS 214463, at *131 (E.D. Tex. 2019); *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998); *Yale & Annie Slocum v. Livington*, No. H-11-486, 2012 U.S. Dist. LEXIS 79792, at *19 (S.D. Tex. June 8, 2012). To establish deliberate indifference, a plaintiff must plead facts showing that the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and that the official also drew that inference. Deliberate indifference is more than negligence or gross negligence. Inept, erroneous, ineffective, or negligent actions or decisions by officials do not constitute deliberate indifference nor do they divest the officials of qualified immunity. *Yale & Annie Slocum v. Livington*, 2012 U.S. Dist. LEXIS 79792, at

55

*19–20. To meet the "stringent standard of fault" for deliberate indifference, a "plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation." *Id.* (internal citations omitted).

174.   In *Smith v. Brenoettsy,* the 5th Circuit Court of Appeals found that a Warden was liable for failure to supervise his deputies when an inmate was stabbed by a jail guard, after the inmate submitted complaints to the Warden describing harassment at the hand of the guard Brenoettsy and asking the Warden to supervise the guard. *Smith v. Brenoettsy*, 158 F.3d 908, 910 (5th Cir. 1998). The Warden asserted that he could not be held liable for a failure to supervise because over 6,000 complaints are sent to him and he cannot be expected to have looked into every single complaint. *Id at* 911 The court instead held that  all that is required is that "the official . . . be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists". *Id. at*  912

175.   In this current case, it is undisputed that Ms. Kathy White was the Health Service Administrator for Galveston County Jail through their contract with Soluta Health. As the health service administrator, per the Boon & Chapman (Soluta Health) policies and procedures manual Kathy White "is responsible for arranging all levels of healthcare as well as assuring access, quality, and timeliness of

healthcare for inmates." [See Ex. V Health Services Policy & Procedures Manual Galveston County Jail p. 11**]**.

176.   During Mr. Cortez stay at the Galveston County Jail, there were over seven separate documented instances where Mr. Cortez received delayed medical treatment. Those days were: April 22, 2017, April 23, 2017, April 28, 2017, May 1, 2017, May 2, 2017, May 05, 2017, May 16, 2017, May 20, 2017 , May 21, 2017, May 22, 2017, May 23, 2017, May 24, 2017, May 25, 2017, May 26, 2017, and May 29, 2017. [*See* Appendix A-Cortez medical response]. On these days the Galveston County Jail medical staff (Soluta Health) did not follow their own policies and procedures to ensure that Mr. Cortez was seen in a timely fashion. Instead due to the staff not properly handling the sick call requests, Mr. Cortez was not seen for two or three days after the request was made and in some instances even up to five or six days later.

177.   Like in *Smith v. Brenoettsy,* where the Warden was found to be on actual notice due to the complaint letters sent to him by the inmate, because Kathy White was the HSA and a key part of her response is ensuring that inmates receive adequate healthcare in a timely manner, she was on actual notice after the first few instances (e.g., April 22, 2017, April 23, 2017, April 28, 2017, and May 2, 2017) of delayed medical care that her staff was not complying with the policy. Kathy

White's failure to act after her staff failed to timely provide Mr. Cortez medical care led to the staff denying Mr. Cortez medical care from May 23, 2017 to May 29, 2017, a period in which Mr. Cortez consistently complained of difficulty breathing and begged in writing and orally for medical care. [Sick call requests filled out by Cortez May 23, 2017 to May 29, 2017]. As a result of the medical staff delaying Mr. Cortez's medical care, fluid continued to build up on his lungs during those days and the staff did nothing to determine the cause of Cortez decreasing medical health.

178.   In the S*abbie v. Southwestern Corr. LLC,* that court found that the LPN (nurses) acted with deliberate indifference to the inmate who was in their care because the nurses were gatekeepers between the inmates and the healthcare providers (doctors), so an inmate could not see a provider unless a nurse believed that their medical condition necessitated it. *Sabbie v. Sw. Corr., LLC*, No. 5:17cv113-RWS-CMC, 2019 U.S. Dist. LEXIS 214463, at *121 (E.D. Tex. 2019) The nurses failed to document the patient's visit, follow governing protocols, look at his patient charts or take the inmates vitals on occasions, even though they knew that the inmate had hypertension and high blood pressure, they also failed to neither checked his blood sugar nor his blood pressure. *Id.*

179.   In the taped deposition of Ms. Kathy White, she unequivocally states that Boon- Chapman/Soluta Health do not provide extra training for the medical staff on how to do a proper physical assessment of patients in their custody. Instead they rely on the medical personnel's experience and training from school. (see Ex. F Kathy White Deposition at 5:51:39 pm -5:52:04 pm).

180.   Furthermore there is evidence that the medical staff at the jail were not properly trained to handle inmates who are exhibiting shortness of breath. [*See* Ex. W-Boykins Deposition at 36:00–37:00]. Defendant Boykins claims that she received training on how to deal with breathing issues in patients at school and she later received more training on the job, however the training on the job that she received was a basic training on how to properly use a stethoscope, what to listen for, an O2 stat meter, and to look for distress in a patient. [*See* Ex. W-Boykins Deposition at 46:30–47:15]. However, the training of the inmates did not include examples of what the breathing of a patient who is experiencing short of breath may sound like. [*See* Ex. W-Boykins Deposition at 47:15–48:00].

181.   The failure to train the medical staff on how to properly assess a patient's breathing functionality lead to the delay and denial of Mr. Cortez receiving medical attention for his breathing issues from a medical provider before May 31. (See Appendix A). On May 22nd although Mr. Cortez does see Dr. Killyon, he was

never treated for his breathing issues by Dr. Killyon that day because the nurses on duty (gatekeepers) that day did not make it known to the provider that Mr. Cortez was complaining of shortness of breath, although Mr. Cortez complained numerous times to both the medical staff and jail staff in writing that he was experiencing shortness of breath. (see Ex. L Killyon Deposition p. 72 &7 3 ln 21-25 & 1-2).

182.   In this current case just like in Sabbie, the gatekeepers between the patient and the healthcare provider were the nurses who would screen the patient to determine if the patient needed to see a provider. In the Sabbie case, the nurses failed to refer the patient to a provider although they knew his medical history and he continually showed up in the clinic with harsh symptoms. Here, the nurses were not trained on how to properly screen a patient who is having trouble breathing and they failed to alert the provider to the patients consistent complaints of breathing when the provider saw him on the May 22, 2017. The failure to train led to a delay and denial of medical care for his serious medical need of pleural effusion (fluid in the lungs). Furthermore, the gatekeepers acted with deliberate  indifference when after the May 22, 2017, as the patient continued to put in sick call requests and beg to be seen by a provider on the May 23, May 24 and May 25, they failed to treat him or refer him to the medical provider again to for the serious medical condition of shortness of breath. (See Appendix A).

***It is undisputed that Sheriff Trochesset's delegation of his duties to provide adequate medical care do not absolve him from his duties as Sheriff, thus he is still liable in his individual and official capacity.***

183.    Sheriff Trochesset's delegation of medical duties to Soluta/Boon Chapman and Defendants do not absolve him from his duties as sheriff. In *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250 (1988), the United States Supreme Court reiterated that "contracting out medical care does not relieve the state of its constitutional duty to provide adequate medical treatment to those in its custody." Sheriff Trochesset has a duty to provide adequate medical  care to those in his custody. By delegating those duties to Soluta/Boon Chapman and defendants, Sheriff Trochesset duty still remains with him.

184.    "In Texas, the county Sheriff is the county's final policymaker in the area of law enforcement, not by virtue of the delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected." *Turner v. Upton County, Tex.*, 915 F.2d 133, 136 (5th Cir. 1990) (citing *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980). Where the care of inmates is concerned, state law specifically provides that "the sheriff of each county is the keeper of the county jail." TEX. LOC. GOV'T CODE § 351.041(a). As such, a county sheriff is required to "safely keep all prisoners committed to the jail by a lawful authority, subject to an order of the proper court." *Id.* "The sheriff may appoint a jailer to operate the jail and meet the needs of the prisoners, but the sheriff shall continue to exercise supervision and control over the jail." *Id.* at § 351.041(b). Under TEX. LOC. GOV'T CODE § 351.041(a), the sheriff is legally

responsible for operating the county jail. *Brown v. Callahan*, 623 F.3d 249 (5th Cir. 2010).

185.   The policies and customs of Soluta/Boon Chapman and defendants are in fact policies that sheriff Trochesset maintains under his duty to provide adequate medical care.

186.   These policies highlighted in this complaint including but not limited to, collecting sick calls once a day which delayed Mr. Cortez access to medical care; understaffing of the jail clinic staff on weekends; and failing to address and treat Mr. Cortez's complaints of shortness of breath are all policy decisions that sheriff Trochesset implemented. These policy decisions did not meet the medical needs of Mr. Cortez.

## CONCLUSION

Defendants have failed to meet their burden to establish they are entitled to summary judgment. Plaintiffs respectfully request that this Court deny Defendants' Motion Summary Judgment in its entirety. Plaintiffs further request that it be granted such other and further relief to which it may be justly entitled.

Respectfully Submitted,
The Lewis Law Group PLLC.
By: /s/ U.A. Lewis
U.A. Lewis
State Bar No. 24076511
P. O. Box 27353
Houston, TX 77227
Email: myattorney@thelewislaw.com
Attorney-in-charge

**CERTIFICATE OF SERVICE**

I certify that on December 16th 2019, I filed a true and correct copy of the foregoing Combined Response to Defendants' Motion for Summary Judgment on the Court's CM/ECF system serving all parties' counsel of record.

/s/ U.A. Lewis

U.A. Lewis

## APPENDIX A

Upon intake on April 7, 2017, Jorge Cortez was 160lbs and viewed by Alexis Ensley, a certified medical assistant ("CMA"), and described to be in good health. [See Ex.-QEnsley Deposition].

### JORGE CORTEZ'S SIGNS OF MEDICAL DISTRESS:

| Request Date in 2017 | Description | Medical Response | Response Date in 2017 |
|---|---|---|---|
| **4/08** | **Heartburn (GC05314-Sick Call)** | **OTC Tums in booking (GC5278-GC5280)** | **04/08** |
| **4/11** | **Dizziness, request for bottom bunk** | **None** | **N/A** |
| **4/15** | **Dizziness, request for bottom bunk** | | |
| **4/17** | **Dizziness, request for bottom bunk** | **None** | **N/A** |
| **4/19** | **Dizziness, request for bottom bunk** | | |
| **4/20** | **Lower Back Pain (GC05303-Sick Call)** | **None** | **N/A** |
| **4/22** | **Dizziness, request for bottom bunk (GC05311-Sick Call)** | **Acknowledgment beyond 48hr period** | **4/25** |
| **4/23** | **Coughing, Sore Throat (GC0530-Sick Call9)** | | **4/25** |
| **4/23** | **Throwing up, Flu symptoms (GC05308-Sick Call)** | **None** | **4/25** |
| **4/28** | **Coughing (GC05306-Sick Call)** | **Acknowledgment beyond 48hr period** | **5/01** |
| **5/1** | **Nasal discharge, throat redness, and congestion. (GC06043-*Med Notes*)** | **CTM 4mg(allergy med.) and Ibuprofen 400mg** | |
| **5/2** | **Weakness, request for bottom bunk (GC05305-Sick Call)** | **Acknowledgment beyond 48hr period** | **5/05** |
| **5/16** | **Too weak to Climb, *Vomited and weak epigastric pain (GC06035-Med Notes), (GC05304-Sick Call)*** | **None** | **N/A** |
| **5/20** | **Lower Back Pain** | | **N/A** |

| 5/21 | Neck & Back pain (GC05295-Sick Call) | | N/A |
|---|---|---|---|
| 5/22 | *"Can't breathe" back shoulder pain request for bottom bunk* | Seen by LVN c/o SOB & Congestion; then Seen by M.D. SOB not evaluated | N/A |
| 5/23 | "trouble breathing" "Can't sleep" Complaints of Back and Neck Pain *(GC06036-Med Notes); (GC05300)* | The evaluation did not include a respiratory exam given ibuprofen. "Check to see if [Dr.]wants to see him in the AM" | 5/23 |
| 5/23 | Trouble Breathing (GC05301-Sick Call) | | 5/29 |
| 5/24 | Complained of severe Neck & Back pain (GC05298-Sick Call) | Muscle rub cream provided. Response beyond 48hr period | 5/29 |
| 5/25 | Complained of severe Neck & Back pain (GC05299-Sick Call) | Acknowledgment beyond 48hr period | 5/29 |
| 5/26 | Neck & Back pain, Trouble breathing, pain 10/10. X-Ray requested by Mr. Cortez (GC05297-Sick Call) | Acknowledgment beyond 48hr period | 5/29 |
| 5/29 @8:45a | Complained of Shortness of Breath and Chest pain( GC06039-*Med Notes*)[4] | LVN Boykins failed to adequately examine Cortez, noted lungs to be clear | 5/29 |
| 5/30 | Complained of pain in neck and shoulder (GC05296) | | 5/31 |
| 5/31 | Trouble breathing; complained of | Seen by CMA Ashley | 5/31 |

[4] On 5/29/17, surveillance video @9:01 depicts Boykins opening a drawer and removing items, what looks to be a stethoscope, she reaches to a box on the wall and grabbed a pair of gloves, and moves toward Mr. Cortez with while placing a stethoscope around her neck, and into her ears, from 9:01.48-9:02:08 (20 seconds) she placed the stethoscope to his back to listen for lung sounds on four different locations. [Ex. R] The proper way to listen to lung sounds is at a minimum of 10 secs per position, as the patient inhales and breathes in. (See. Ex. B Affidavit of Dr. Lloyd).Ensley stated that she heard nothing then based her opinion on the fact that she heard nothing that the lungs were clear. However, if nothing is what is heard when listening to the lungs it is an indication of a serious problem because with a healthy patient a sound of air flowing threw the lungs is what should have been heard. (See. Ex. B Affidavit of Dr. Lloyd). The video goes on to depict Mr. Cortez pointing to different areas of his upper body. 9:03:33 Boykins placed a thermometer in Mr. Cortez's mouth and an oximeter on his right index finger; however, she failed to test it or clean Mr. Cortez's finger prior to its use.

| | | | |
|---|---|---|---|
| | back pain (GC05294) | Ensley | |
| **5/31** | **Trouble breathing; complained of back pain and requested an MRI (GC05294)** | **Seen by Carl Hart, NP, but undocumented.** | **Hospital, Critical** |

| Bunk Bed Request | | Medical Response |
|---|---|---|
| Requested bottom bunk due to feeling disoriented, dizzy, and motion sickness. | 4/11/2017 | None |
| Requested bottom bunk due to dizziness and he almost fell from the top bunk. | 4/15/2017 | Patient was informed that he does not fit the criteria for a bottom bunk pass on 4/19/2017. |
| Requested bottom bunk due to dizziness and cites his age. | 4-22-2017 | None |
| Requested bottom bunk due to his age, states that he does not have the strength to climb up and down the top bunk and almost fell again. | 5-02-2017 | None |
| Requested bottom bunk due to weakness and numbness in his left arm and cites difficulty climbing to the top bunk. | 5-16-2017 | None |
| Requested bottom bunk due to falling from the top bunk. | 5-21-2017 | Was finally assigned a bottom bunk on 5-22-2017 due to pain in his arm. |